In the
# United States District Court
For the
## Western District of Wisconsin

Glen R. Bayless,

      Plaintiff,

                                Case No.     25-cv-642

     v.

RBC Capital Markets, LLC, and
Patrick Pfahl, the City of Superior, Wisconsin and
Jeffrey Harriman, in his official and individual capacities

      Defendants.

# COMPLAINT

## I.    NATURE OF ACTION

101.    This is a civil action seeking damages to compensate the Plaintiff, Glen R. Bayless, for the injuries he sustained when his contractual rights to transition his financial advising practice to another financial advisor in the corporate defendant's employ were maliciously interfered with and dishonored.

## II.     JURISDICTION AND VENUE

### A.     Jurisdiction

201.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) (diversity jurisdiction).

202.    The amount of the Plaintiff's damages exceeds $75,000.

203.    The Plaintiff, Glen R. Bayless, is a citizen of the State of Florida and the Defendants are citizens of states other than Florida for the purposes of diversity jurisdiction analysis.

### B.     Venue

202.    The Western District of Wisconsin is a proper venue for this action because a substantial part of the events or omissions giving rise to the claim occurred within the geographical boundaries of the Western District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III.    PARTIES

### A.     Plaintiffs

301.    Plaintiff Glen R. Bayless is an adult male resident of the State of Florida.

**B.    Defendants**

302.    Defendant RBC Capital Markets, LLC, is a business entity with the capacity to sue and be sued in this Court.

303.    Defendant Patrick Pfahl is a natural person with the capacity to sue and be sued in this Court. At times material hereto, he was a financial advisor for RBC Wealth Management.

304.    Defendant City of Superior, Wisconsin, is A Wisconsin City with the capacity to sue and be sued in this Court.

305.    Defendant Jeffrey Harriman is currently a captain in the City of Superior Police Department. He is sued in his official and individual capacities, because he has made the decisions not to return Plaintiff Bayless's personal property, and has the authority to return it.

## IV.    ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

401.    On Thursday, June 16, 2022, the Plaintiff, Glen R. Bayless, was employed as a financial advisor by RBC Wealth Management, a division of the Defendant, RBC Capital Markets, LLC, working out of the company's Duluth Minnesota, office. He had been employed by RBC Wealth Management for over 30 years.

402.    On that date, the Superior, Wisconsin, Police Department executed a search warrant at Glen R. Bayless's home at 4 Beacon Lane in Superior, Wisconsin.

3

403.     This investigation was being spearheaded by Jeffrey Harriman, then a sergeant with the Superior Police Department.

404.     At the conclusion of their search, Sgt. Harriman informed Sandra and Glen Bayless that they would have a complete inventory of everything that was taken by the end of the day (on the 16th) or at the latest, by the 17th.

405.     In the Return that he executed on June 16, 2022, Harriman listed the following items as having been seized:

1.     Dell Latitude CP laptop with black zippered nylon case
2.     Gray Samsung cell phone in black case
3.     Black Synology network attached storage device
4.     Apple iPad in teal flowered case
5.     Samsung Galaxy S3 cell phone
6.     Samsung Galaxy S5 cell phone
7.     Samsung Galaxy watch
8.     Silver Apple Macbook
9.     Apple iPad with Glen R Bayless engraved on the back
10.     (3) 64 GB SD cards
11.     Apple iPad in black and white case
12.     Black Fractal Design computer tower

406.     Mr. Bayless needed to have his cellular phone to be able to log onto the RBC system from outside of his office, so it was imperative that Mr. Bayless have that device to do his job remotely.

407.     When asked how long it would be until Mr. Bayless would be able to get his phone back, Sgt. Harriman said that Mr. Bayless would likely get his phone back either the next day (Friday, the 17th) or, at the latest, Monday, the 20th.

4

408.    However, he then informed Mr. Bayless that if there was evidence of a crime on any device, they would likely hold that device indefinitely.

409.    Mr. Bayless then asked, "Am I able to get any of my work files – spreadsheets, client logs, calendars, contacts, and so on – back?"

410.    Sgt. Harriman said that, maybe, Mr. Bayless's attorney and the city could work something out to get the files recovered and returned. His answer didn't sound promising.

411.    Mr. Bayless spent the remainder of that day meeting with his attorney, Richard Gondik, and going to Best Buy to purchase a new phone – as well as in attempting to rebuild his contact list from memory.

412.    The following day, Friday, June 17, 2022, at 9:29 a.m., Mr. Bayless called the  Royal Bank of Canada, Central Region, St. Paul Complex Director, Lauri Droster to do several things:

413.    First, Mr. Bayless felt he should alert his employer as to what was going on and should ask for its advice on what to do. The Royal Bank of Canada (RBC) has over 80,000 employees and Mr. Bayless was fairly confident that somewhere in an organization of that size, they had likely experienced something like this before and could possibly offer Mr. Bayless some good advice as to what actions he should take next.

414.    Second, Mr. Bayless was calling to ask for her advice as to what he should do to best preserve his deferred compensation package with the firm (aka: his

Wealth Accumulation Plan or "WAP") that he had built up over 32 years of working at RBC, as well as the value of his book of business, meaning his ongoing professional relationships with his investment clients, which RBC publications sometimes referred to as his "practice."

415.    Finally, Mr. Bayless was calling to ask for help as to how best to protect the firm in the event charges were filed, and to ask if he should just resign immediately, before any potential charges could be filed. Mr. Bayless was particularly concerned about this because if charges were, indeed, filed while Mr. Bayless was still employed with the company, RBC could then terminate Mr. Bayless "for cause" and, in that event, RBC would be able to rescind every penny the company had ever deposited into Mr. Bayless's deferred compensation plan – including any and all growth on those dollars. In addition, they could confiscate Mr. Bayless's entire book of business with no compensation to Mr. Bayless or his family – which could all add up to approximately $6,000,000 in immediate losses to Mr. Bayless and his family.

416.    After Mr. Bayless explained the situation, Ms. Droster said she needed to think about it and asked if she could call Mr. Bayless back. Mr. Bayless said sure and they hung up.

417.    At 11:04 a.m., on Friday, June 17, 2022, she called Mr. Bayless back and suggested that Mr. Bayless call Julian Neal or Lynn Bergman in Compliance and Todd Schnell in Employee Relations first, because it was going to be a long weekend. "Juneteenth" was occurring on Sunday and Monday was an official holiday for the

firm, so many employees were going to be leaving early that day due to the long weekend. She could see that Julian Neal and Lynn Bergman were logged onto their RBC computers and available to talk and she thought Todd Schnell would be good to talk with if Mr. Bayless could get him - as his department dealt with these things. Mr. Bayless thanked her and they hung up.

418.    At 11:30 a.m., Mr. Bayless called Julian Neal first and the call went immediately to voicemail. Mr. Bayless didn't leave a message. He then immediately called Lynn Bergman. Mr. Bayless got her voicemail as well and left a message for her to call him back as soon as possible before leaving for the long weekend. At 11:40 a.m., Lynn Bergman called Mr. Bayless back and Mr. Bayless explained what he could of the situation. Ms. Bergman said she didn't know what Mr. Bayless could – or couldn't - do to protect himself or the firm and she suggested that Mr. Bayless call Susan Markunas, a Senior Manager in Compliance in New York.

419.    At 11:45 a.m., Mr. Bayless called Susan Markunas, and she answered immediately. Mr. Bayless explained his situation again, as much as he was able, and she said that she needed to think about it a bit. She said she did not want Mr. Bayless to have to continue to repeatedly explain his situation over and over again, as she knew how painful it was for Mr. Bayless to continue to recount it. Mr. Bayless thanked her and she said she would call Mr. Bayless back that afternoon, for sure.

420.    At 12:46 p.m. CDT, Ms. Markunas called Mr. Bayless back and said that the person who she felt could best help him was Ashley Miller. Ms. Miller worked

in the Employee Relations area and worked with Todd Schnell. Mr. Bayless thanked

Ms. Markunas for all her help and they hung up. Mr. Bayless immediately (at 12:51

p.m.) called Ashley Miller (trying to catch her before she left for the long weekend.)

421.    Ms. Miller answered quickly and, again, Mr. Bayless explained Mr.

his entire situation the best he could. Mr. Bayless got choked up while telling her about

it and she said that she absolutely understood his concern. She assured Mr. Bayless that

she was going to talk to her "Team Lead" and was going to get back to Mr. Bayless that

afternoon.

422.    Since it was still before one o'clock, Mr. Bayless felt she was being

genuine and would get back to him with *something* before the end of the day – even if

she couldn't get in touch with her "Team Lead" or anyone else.

423.    At 2:04 p.m., Lauri Droster called Mr. Bayless and asked how

things were going and Mr. Bayless told her of the sequence of phone calls he had made

since they had spoken. They were both hopeful that Mr. Bayless was on the right track

with Ms. Miller. Ms. Droster said that she believed that Todd Schnell was the "Team

Lead" that Ashley would be speaking with and that, too, made Mr. Bayless happy

because these were all the right people to have involved, according to Ms. Droster.

424.    Mr. Bayless did not hear anything back from Ashley Miller – nor

anyone else – that Friday afternoon. Then, Mr. Bayless had to endure the long

"Juneteenth Weekend" and pray that no criminal charges would be filed over the

weekend because, guilty, not guilty or otherwise – simply having a criminal

8

prosecution commenced against Mr. Bayless would cause an instant $6 million dollar loss to him, personally.

425.    Finally, on Tuesday, June 21, 2022, Mr. Bayless called Tom Sagissor (the President of the entire U.S. Wealth Management Division of RBC) to ask him for his help and advice as to what Mr. Bayless should do to best protect the firm and Mr. Bayless's own deferred compensation and interest in his book of business. Mr. Bayless ended up just leaving him a message.

426.    Two days later, on June 23, at 9:18 a.m., Mr. Sagissor called Mr. Bayless back. Mr. Bayless explained what Mr. Bayless could and, through the course of their 14 minute call, Mr. Sagissor simply suggested that Mr. Bayless "stay the course, keep working" and, for all intents and purposes, "do nothing." Mr. Bayless thought that was terrible advice and wanted to inquire further but, Mr. Sagissor had a meeting he needed to get into, and ended their conversation.

427.    Slightly less than a half hour later, at 10:05 a.m., on that same day, Lauri Droster again called Mr. Bayless to see how things were going.

428.    Mr. Bayless explained what Mr. Sagissor had suggested and let her know that he had not heard anything back from Ms. Miller, Mr. Schnell, or anyone else in the firm. She did not seem overly concerned but said that she was going to try to get some people to give Mr. Bayless some of the help he had been trying to access.

429.    After Ms. Droster and Mr. Bayless hung up, Mr. Bayless tried to call Todd Schnell. He was the Senior Director of Employee Relations and Mr. Bayless really

wanted to speak with him. Mr. Bayless called him at 10:36 a.m. on Thursday, June 23.

He did not answer his phone and so Mr. Bayless left him a fairly detailed message and

asked him to call Mr. Bayless back at his earliest convenience.

430.    At 12:00 noon, Mr. Bayless received an email from Ms. Droster that

said, "Hi, I've left a message with the comp people (Nick Sandvig) to get the details. If

you talk to Todd Schnell, please ask him about that also and he may have info for you.

Thx, L."

431.    That was the last thing Mr. Bayless heard from anyone at RBC

Wealth Management for two and a half weeks - until July 11, 2022 at 3:22 p.m. - when

Mr. Bayless received an email invitation from Ashley Miller to join a Webex (video call)

with her and Andrew Bodick (Senior Compliance Investigation Manager). The

invitation was entitled, "Confidential Follow-Up." In the "Message" portion of the

invitation, she wrote the following:

> Hello Glen-
>
> If you will recall, you and I connected on June 17th, 2022.
>
> A few pieces of information have come to the firm's attention related to the June 17th call, and Andrew Bodick (Compliance) and I would like to reconnect with you to discuss.
>
> Please plan to take this meeting from a space where you will feel comfortable speaking candidly and where other RBC employees won't overhear our discussion, such as a closed door office.
>
> If the time proposed will not work for you, please counter with a time that will.
>
> Thank you,

Ashley

    432.   Mr. Bayless responded at 3:59 p.m. that same day and Mr. Bayless

said,

> I'm curious as to where any additional pieces of information have come from... I've heard nothing further and remain utterly in the dark as to where things are heading.

    433.   Then, at 4:15 p.m., Mr. Bayless wrote to both Ashley and Andrew,

the following:

> Further, do I need my attorneys on this call with me? Is this the call where I'm getting fired/let go from the firm?
>
> I'm leaving for the day... I'm physically ill at this point and going home. If you could reply to my personal email, that would be helpful (since I don't have access to anything "RBC" away from my desk here in my office).
>
> Thank you.

    434.   Mr. Bayless heard nothing back until the following morning at 7:58

a.m. when he received an email from Ashley Miller addressed to both Andrew Bodick

and Mr. Bayless which read:

> Good Morning Glen-
>
> The purpose of today's meeting, as noted in the invite sent yesterday, is to get clarification on information that has come to the firm's attention, not termination.
>
> Your lawyer need not be present. Please plan on attending the meeting as scheduled.
>
> Thank you,
>
> Ashley Miller

435.    Mr. Bayless immediately called his personal attorney, Richard Gondik, and set up an appointment for him to be present on the call.

436.    At 1:30 p.m., they were logged into the Webex call and M. Miller and Mr. Bodick logged in slightly thereafter. The moment they learned that Mr. Bayless's attorney was on the line with Mr. Bayless, they ended the call as quickly as they could. They said they would get back to Mr. Bayless at some point with a new time for a call – however they did not contact Mr. Bayless for several weeks.

437.    Lauri Droster contacted Mr. Bayless one more time, on July 14, (the day after the video conference that did not happen with Ms. Miller and Mr. Bodick) and asked how Mr. Bayless was doing. As Mr. Bayless had anticipated, she had already been fully briefed on the call that did not happen the day before. Mr. Bayless explained that he felt as if the firm was out to get him and she said that the firm felt as if it was Mr. Bayless who was out to get them.

438.    Mr. Bayless then asked Ms. Droster what the videoconference had been going to be about and why Mr. Bayless's attorney could not have been present for it, she simply said that they were going to ask Mr. Bayless "if anything of RBC's was taken in the search." Mr. Bayless said it seemed weird that they could not have just asked him that in an email or an unscheduled phone call. He said it felt like she was playing defense for something that they were trying to do with that videoconference.

439.    On August 1, 2022, at 10:17 a.m., Mr. Bayless received another email from Ashley Miller. This email read:

12

Hello Glen-

This email is a follow-up to the discussion scheduled for Tuesday, July 12, 2022, with you, Andrew Bodick (Compliance) and me (Employee Relations). As noted in the invite Mr. Bayless sent then, the purpose for that meeting was to gain clarification relating to some questions RBC has, based on information that you brought to the firm's attention.

Prior to the July 12th, 2022 meeting, you responded to the invite, asking if the purpose of the meeting was to terminate your employment and if you needed a lawyer present. I responded to your email, reiterating the purpose, as outlined in the initial invite. I also advised you, in the same email, that your lawyer did not need to be present.

Your attorney was present at the July 12th, 2022 meeting, and spoke on your behalf for the duration of the short call, which resulted in Andrew and me ending the meeting.

As an RBC employee, you are obligated to adhere to RBC's Code of Conduct, specifically Section 2.3 (Investigations, Inquiries, and Reviews), which states, "At times, they may be asked to participate in an internal or external investigation, inquiry, or review of concerns or possible misconduct. (Employees) have a duty to cooperate and provide honest, accurate, complete and timely information."

RBC needs to have an internal discussion with you as an employee of RBC. As such, I will be rescheduling the planned meeting with you, Andrew and myself for today, (Monday, 08/01/22 at 2:00 p.m. CST). There will be an invite sent, following this message.

Your attorney is not entitled to be present for an internal meeting, and cannot be in attendance for this rescheduled meeting or any subsequent internal meetings, either in person or over the phone.

Please plan to attend today's meeting via Webex, with your camera on, and from your branch office. Please note that failure to cooperate in this review process, as outlined, may result in disciplinary action, up to and including termination of your employment.

Thank you,

Ashley

440.    Mr. Bayless immediately forwarded the email over to Attorney
Gondik to get his feedback on what Mr. Bayless could do.

441.    The meeting went as planned. The company's purpose was, on the
surface, to find out if the Superior Police Department had taken anything belonging to
RBC in the execution of the search warrant.

442.    After that meeting concluded, Mr. Bayless was still attempting to
do his job.

443.    On Friday, August 12, 2022, everything took a dramatic turn. Mr.
Bayless decided to write an email to anyone and everyone in RBC that might be
interested in buying his book of business.

444.    Mr. Bayless knew from RBC's own spreadsheet entitled Glen
Bayless Heritage Transition Valuation, that the value of Mr. Bayless's practice was still
approximately $2,200,000.

445.    As Mr. Bayless walked into the RBC facility on August 12, 2022,
Patrick Pfahl[1] was sitting in his office reception area – which was unusual. Mr. Bayless's
assistant, Deb Sinnott, had mentioned to Mr. Bayless about 6 months earlier that Mr.
Pfahl was interested in buying Mr. Bayless's book of business. However, before the
search warrant execution, Mr. Bayless had already entered into a "handshake deal"
with another financial advisor (Tom Pink, in the Stillwater, Minnesota office of RBC) to

---

[1] Pronounced: Fall.

14

buy Mr. Bayless's practice for $2.5mm under the terms of RBC's Platinum Plan (explained below). The premium price over the $2.2 million computed by RBC was because Mr. Bayless was only 57 years old and was going to have to pay for his own health insurance until he was 65 and eligible for Medicare. The agreement on the 2.5 million dollar price rather than $2.2 million was in part to incentivize Mr. Bayless's departure before age 65. Mr. Bayless had told Ms. Sinnott at the time of his original expression of interest to tell Mr. Pfahl that Mr. Bayless wasn't interested in looking at other offers.

446.    After the execution of the Superior Police Department search warrant, Mr. Bayless had called Mr. Pink right away and told him what Mr. Bayless could about what was going on. After Mr. Pink had thought about it for a few days, he had informed Mr. Bayless that their deal was off and Mr. Pink was no longer interested.

447.    On August 12, 2022, Mr. Bayless invited Mr. Pfahl to come into his office. He did, and they discussed the situation as it stood at that time. No charges had been filed against Mr. Bayless. No buyer for Mr. Bayless's practice had emerged, although he was yet to send out his email soliciting potential buyers, and it was Mr. Bayless's desire to be done with RBC as quickly as humanly possible to preserve his deferred compensation and the value of his practice. Mr. Bayless and Mr. Pfahl discussed all these things for the better part of the morning and came to a handshake agreement for Mr. Pfahl to buy Mr. Bayless's practice for the sum of $2,250,000.

15

448.     Their agreement was that the sale of Mr. Bayless's practice to Mr. Pfahl would be handled under RBC's "Platinum Transition Plan."

449.     There were two Transition Plans at RBC: Platinum and Gold. The Platinum Plan was exclusively available to Financial Advisors selling their practices who had Trailing 12 months of production in excess of $550,000, a minimum of 5 years with the firm, a turn ratio (average fee) of less than 150 basis points (1.5%) and a clean compliance record. Under the Platinum Plan, the selling advisor receives 25% of the money immediately upon retirement. Then, the remaining 75% is paid out over the next 36 months in equal installments. The terms of the Gold Plan are less favorable to the selling financial advisor.

450.     Mr. Bayless and Mr. Pfahl called Ms. Droster three separate times that day and she said she was "on board" to help push their arrangement through quickly. She sent the worksheets to them and contacted Daniel Korman (RBC's Heritage Transition Specialist who fills out the contracts and oversees the transition of the clients and purchase payments) and told him to get in contact with Mr. Pfahl and Mr. Bayless first thing on Monday morning.

451.     Monday came with no contract from Mr. Korman.

452.     On that day, Mr. Pfahl came into Mr. Bayless's office, shut the door, and said:

> Glen, one of my clients is an officer on the Superior Police Force. I called him to see if there was anything I needed to know about your situation before I buy your book and he informed me that he was one of the officers

in your house that day. He told me that they were looking for child porn and that they seized all your electronics. He also said that they were all excited to execute the search warrant on your house because you're the rich guy at the end of Belknap that they all hate.

453.    At that time the search warrant and affidavit were not matters of

public record and were being treated as confidential by the Superior Police Department.

454.    Mr. Pfahl used his professional relationship with an officer of the

Superior Police Department to obtain information about the investigation, of which the

search of Mr. Bayless's residence had been a part, that was not available to the general

public, and he then used that information to his financial advantage and Mr. Bayless's

financial injury.

455.    Mr. Pfahl went on to tell Mr. Bayless that the police had found

nothing of evidentiary value on the seized electronics and so they had sent them to the

FBI to try to recover all of Mr. Bayless's deleted files.

456.    Mr. Pfahl concluded by saying,

Glen, you're gonna be in big trouble. They are throwing tons of money and assets at this – and they are also trying to connect you to the guy that's in trouble from your gymnastics center because they think you're part of it, too - and because of that, I'm not going to pay you $2.25 million for your book. There's too much risk. I'll give you $1 million – but that's it.

457.    The person from Mr. Bayless's gym to whom Mr. Pfahl was

referring was George Deppa. Mr. Deppa had been an instructor at Twin Ports

Gymnastics. Mr. Bayless was the majority owner of the building where Twin Ports

Gymnastics was housed. In addition, Mr. Bayless's daughter was active in gymnastics,

which was why Mr. Bayless became involved with the building in the first place. Mr.
Deppa and Mr. Bayless had known one another for years as friends. As of August, 2022,
Mr. Deppa stood accused of inappropriate sexual conduct with two minor girls. The
Superior Police Department was trying to connect Mr. Bayless to Mr. Deppa's
misconduct with those girls, but, there was no connection whatsoever between Mr.
Bayless and anything illegal, unethical, or improper that Mr. Deppa had been involved
in.

458.    Mr. Bayless told Mr. Pfahl he was not interested in selling his
practice for the reduced price Mr. Pfahl was then offering. After a significant amount of
negotiation, they finally agreed on a new price of $1,500,000. Mr. Bayless was now
looking at selling his practice for a full $1 million below what had been offered to him
just a few months earlier – prior to the Superior Police Department invading Mr.
Bayless's home and seizing Mr. Bayless's electronics. Mr. Bayless believed, though, that
at least he would be out of RBC and RBC could not withhold his deferred compensation
nor newly agreed payment for the value of Mr. Bayless's practice.

459.    The next day, Tuesday, August 16, 2022, there was still no contract
for the transition of Mr. Bayless's practice provided by RBC. Nor was there on
Wednesday. Mr. Bayless had been calling, emailing, and pushing every way he knew
how to complete the transition.

460.    Finally, on Wednesday, August 24, twelve days after Mr. Pfahl and
Mr. Bayless had come to their original agreement and after Mr. Bayless had called Ms.

Droster three times that day to tell her to hurry because he had over $6 million at risk –
the contract appeared in Mr. Bayless's email.

461.   Mr. Pfahl called Mr. Bayless at home and told him to hurry into the
office because the contract was there.

462.   Mr. Bayless drove to the RBC office and found the company's
proposed contract in his email.

463.   The contract proposed by the company transitioned Mr. Bayless's
practice under the Gold Plan, not the Platinum Plan. This meant that there would be no
up-front payment, and, instead of payment in full being spread over 36 months, it
would take 60 months. Additionally, the buyer had the right to check, at 12, 24, and 36
months after the sale to see if the value of the practice had declined more than 10% due
to clients transferring away, and if it had, the payments to Mr. Bayless could be reduced
by the percentage of loss.

464.   The contract proposed by RBC had also been based on a
diminished value ascribed to Mr. Bayless's practice. The new value of Mr. Bayless's
practice (a practice that, according to RBC's 2021 Total Compensation Computation
completed at the end of 2021, had generated $1,453,544.00 in revenue for the company –
and provided Mr. Bayless an income of $796,831.00) had been reduced to 80% of Mr.
Bayless's current trailing 12 months production. In implementing this decision, Daniel
Korman had lowered the sale price from $1,500,000.00 down to $1,140,624.00. The firm's
reasoning was this: Whenever a Financial Advisor dies, their estate receives 80% of that

advisor's trailing 12 month production as payout to the surviving spouse or beneficiaries under RBC's business Continuity Plan. RBC had decided to look at this as if Mr. Bayless had died. This was despite the fact that Mr. Pfahl and Mr. Bayless had agreed that Mr. Bayless would call all of his existing clients and encourage them to the best of his ability to stay with Mr. Pfahl.

465. Mr. Bayless called Wally Chapman and Lauri Droster on the conference line and said, "What the hell is THIS? This isn't the contract I agreed to!! Who changed it? What happened?" They said that they were looking at it as if Mr. Bayless had died – so they gave Mr. Bayless, literally, the worst transition contract they possibly could. Further, they waited until it was the last possible moment to send it to Mr. Bayless and alert him to what they were doing – so he could not change anything. Mr. Bayless tried to explore whether there was any room to negotiate, but Mr. Chapman said, "Glen, that's the only contract I'm going to sign."

466. Mr. Pfahl then came into Mr. Bayless's office and gave Mr. Bayless another interesting bit of information. He said, "If you don't take their deal, they're going to send an investigator up here (to the Duluth office) and start interviewing all the female members of the staff."

467. Mr. Bayless asked, "What are they going to investigate? Me??"

468. Mr. Pfahl said, "I don't know but I think they're going to try to pin something on you... I don't know what, but that's how it seems."

469.     Mr. Bayless replied, "I haven't done anything that would warrant an investigation. Literally, nothing. In 33 years."

470.     Mr. Pfahl also brought this up two additional times in the two days after the contract was signed, but before Mr. Bayless had left the office. Mr. Bayless thought it was odd that Mr. Pfahl would keep bringing this up, but Mr. Bayless let it pass.

471.     Mr. Bayless perceived that he had no choice and signed the transition contract.

472.     Mr. Bayless's last day on the job was August 26, 2022.

473.     RBC sent letters to Mr. Bayless's clients that explained nothing about why Mr. Bayless had left. Mr. Bayless could not telephone his clients because anything he said that could be construed as negative against RBC or Mr. Pfahl would invalidate the transition contract.

474.     Over the course of his last summer at RBC, Mr. Bayless noticed that nobody in the office would talk to him. Before that, walking through the office, people would say, "Good morning" or "hello" or something. Suddenly, Mr. Bayless found he was getting none of that common courtesy. Mr. Bayless did not find out what had actually occurred until his last day in the office, when he was leaving for good. When he went into the office of his manager, Jim Proctor, another advisor in the Duluth office named Vince McKay-Jones was there. Mr. Bayless simply went in to say goodbye to them as he was leaving for the last time. As he talked about how strange retirement was

21

going to be, Mr. McKay-Jones looked up at Mr. Bayless and said, "I think it's important for you to know... I won't say who it was, but I will tell you this: someone in upper management called each of us here in the office and told us not to talk to you." Mr. Bayless was stunned. Upper management had been telling him to continue putting out feelers to advisors to see if anyone would want to buy his practice – while at the same time telling everyone in the office not to talk to him.

475.    Then, on August 30th, Mr. Bayless received an email from Lauri Droster that said, "Hi Glen, Could you give me a call please regarding the alert I received (below)? (I'm hoping they don't have to send all the clients a letter indicating that their data has been compromised!) Let me know what this is about or what happened here – - Thanks! Lauri"

476.    The email contained an RBC Security Alert which stated: RBC Internal Information Including RBC Account Numbers, Names, Financial Information, SSN Number, Non-client Name & Home Address Information sent from Glen.Bayless@rbc.com to Glen@Agatology.com between 8/17/2022 5:15PM – 8/17/2022 6:43PM. The email(s) have been flagged by RBC's Data Loss Prevention services because they appear to contain RBC information which could be classified as RBC Internal, Confidential, Restricted and/or Sensitive.

477.    Mr. Bayless's reply, on August 30, said, "Lauri, I'm not sure what's going on... It's as if someone is trying to set me up. I wasn't in the office on the 17th. I stayed home because I was sick with the stress of all this (see the screenshot of the email

I sent to Tim DeSmet)." At that point, Mr. Bayless included a screenshot of an email Mr.

Bayless had sent to a client (Tim DeSmet) that was dated August 17, 2022, that said, "If

it's business related, you better call Deb. I'm out sick today..."

478.    Mr. Bayless then went on to provide screenshots of emails he had

forwarded to himself from his work computer. These were personal emails that Mr.

Bayless did not want to leave on RBC's servers. He wrote,

> As you can see, there are NO emails to or from myself on the 17th. I'm
> going to need to see exactly what they are referring to because if someone
> sent that email, and it wasn't me, someone is trying to ruin me further
> than they already have. Or, someone is messing with me from within the
> company (either my office or the IT dept.) I'm genuinely concerned at this
> point. I thought this was all in reference to my personal emails on the
> 18th. And now, knowing it's the 17th, it makes it substantially more
> troubling. Please let me know what steps I need to take further. Thanks
> Lauri.

479.    This whole issue blew over after Mr. Bayless wrote that email. RBC

claimed that it had been referring to the personal emails that Mr. Bayless had sent

himself on August 18.

480.    Defendant Harriman was promoted to Captain of Investigations in

March, 2024. He continues to be in charge of the investigation that led to the seizure of

Plaintiff Bayless's property as alleged above.

481.    On or about May 22, 2025, the Superior Police Department released

the following property to Attorney Gondik at his request:

> 1. Rose Gold iPhone;
> 2. Apple iPad with a teal flower case;
> 3. Samsung Galaxy 3;

4. Samsung Galaxy S5;
5. Samsung Watch; and
6. 3 SD Cards.

482.    The City of Superior continues to hold possession of:

- a Dell Latitude CP laptop with black zippered nylon case

- a Gray Samsung cell phone in black case

- a Black Synology network attached storage device

- a Silver Apple Macbook

- an Apple iPad with Glen R Bayless engraved on the back

- an Apple iPad in black and white case

- a Black Fractal Design computer tower

483.    Given that they have now been retained for over three years, some

of these items have probably been lost, destroyed, or damaged.

## V.    BASES OF LIABILITY – STATE LAW CLAIMS

### A.    Tortious Interference with Contract

501.    Defendant Patrick Pfahl tortiously interfered with Plaintiff

Bayless's contractual employment relationship with RBC Capital Markets, LLC.

502.    Defendant RBC Capital Markets, LLC, tortiously interfered with

Plaintiff Bayless's contractual agreement to sell his practice to Patrick Pfahl.

### B.   Conspiracy to Injure Business

503.   Defendants Patrick Pfahl and RBC Capital Markets, LLC, conspired to injure Plaintiff Bayless in his business.

### C.   Failure to Return Seized Property

504.   Defendants City of Superior and Jeffrey Harriman have wrongfully failed to return much of the property seized from Plaintiff Bayless in 2022. Plaintiff Bayless seeks an order compelling its return under Wis. Stat. § 968.20.

505.   In the event that any of this property has been lost, destroyed, or damaged, Plaintiff Bayless will ask this Court to award him lawful compensation. See *Vollmer v. Green Bay City Police Dep't*, No. 18-CV-1629, 2018 WL 6067240, at *3 (E.D. Wis. Nov. 20, 2018) (citing Wis. Stat. §§ 893.35 (action to recover personal property after wrongful taking, conversion or wrongful detention); 893.51 (action for damages resulting from wrongful taking, conversion or wrongful detention of personal property); 893.52 (action for damages from injury to property)).

## VI.   DAMAGES

### A.   Compensatory Damages.

601.   By virtue of the unlawful actions alleged above, Plaintiff Glen R. Bayless has sustained lost compensation, monetary loss, mental and emotional distress,

and injury to his reputation, and has suffered other injuries and other damages, for which he seeks awards of compensatory damages in amounts deemed just by the court.

### B.    Punitive Damages

602.    Because the acts of the Defendants herein alleged were carried out with intentional disregard for the Plaintiff's fundamental rights, the Plaintiff also seeks awards of punitive damages against the Defendants to deter them and others similarly situated from committing similar wrongful acts in the future.

## VII.    CONDITIONS PRECEDENT

701.    All conditions precedent to this action within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII.    REQUEST FOR TRIAL BY JURY

801.    The Plaintiff hereby requests a jury trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Glen R. Bayless, prays the Court to grant him a judgment against the Defendants awarding him the full amount of his damages, together with interest, costs and attorney's fees, appropriate prospective injunctive relief, and such other and further relief as the Court deems just.

26

Dated this Thursday, July 31, 2025.

Respectfully submitted,

Glen R. Bayless,

Plaintiff,

By

RICHARD S. GONDIK, JR., S.C.
RICHARD S. GONDIK, JR.
State Bar Number 1011331
GARRETT M. GONDIK
State Bar Number 1114261
1215 Belknap St.
Superior, WI 54880-2820
Phone:        (715) 395-3180
Fax:          (715) 394-7786
Email:        richardgondik@gmail.com
              garrettgondik@gmail.com

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar No. 1016284
1025 Quinn Drive, Suite 500
Waunakee, WI 53597-2502
Phone:        (608) 283-6001
Facsimile:    (608) 283-0945
E-mail:       jsolson@scofflaw.com

Electronically signed by Jeff Scott Olson

_____

Jeff Scott Olson
ATTORNEYS FOR PLAINTIFF